**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JEAN D'ACCARDI on behalf of herself
and as Guardian Ad Litem for
VANESSA VIGIL and JOAQUIN VIGIL,
Plaintiffs-Appellants,

No. 95-2988

v.

SHIRLEY S. CHATER, COMMISSIONER OF
SOCIAL SECURITY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Fox, Chief District Judge.
(CA-94-135-4-F2)

Argued: June 7, 1996

Decided: September 16, 1996

Before HALL and ERVIN, Circuit Judges, and JACKSON,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

_____

Reversed and remanded by published opinion. Judge Ervin wrote the
opinion, in which Judge Hall and Judge Jackson joined.

_____

**COUNSEL**

**ARGUED:** Lesley Fogleman Moxley, PAMLICO SOUND LEGAL
SERVICES, New Bern, North Carolina, for Appellants. Barbara

Dickerson Kocher, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Jean D'Accardi appeals on behalf of her two children from the denial of their application for Social Security Survivor's Insurance benefits. She contends that the Commissioner of Social Security erred in deciding that her children were not equitably adopted by her deceased husband, based on evidence that he had decided to discontinue adoption proceedings before his death. We agree. Where there exists a valid contract to adopt, but legal adoption does not actually occur, New Jersey courts will enforce the contract in equity under certain circumstances for the benefit of the adoptive child. Ordinary contract principles teach that a promisor's subsequent unilateral decision to rescind does not affect the existence of an enforceable agreement. Accordingly, we reverse and remand with instructions.

I.

Robert and Jean D'Accardi were both divorcees when they met in 1986. After about a year, Jean and her two children--Vanessa and Joaquin Vigil--began spending long weekends at Robert D'Accardi's home. In January 1988, Jean, Vanessa and Joaquin moved into Robert's home. At Thanksgiving 1989, Robert and Jean became engaged, and in December 1989, they began to discuss Robert adopting Vanessa and Joaquin.

The couple married on May 12, 1990. At the time of the wedding, Robert had been diagnosed with cancer, but the disease was in remission. In the summer of 1990, Robert filed a complaint for adoption of Vanessa and Joaquin, aided by Gregory Keller, an associate with the law firm of Stein, Bliablias, McGuire, Pantages and Gigi.

2

During the fall of 1990, Robert's health began to fail and he was hospitalized on several occasions. As a result, the preliminary adoption hearing set for September 21, 1990, was delayed until January 4, 1991.**1** Robert's health continued to decline, and he went to stay with his parents to facilitate his nursing. He later reentered the hospital. Due to his hospitalization, the hearing scheduled for January 4, 1991 was again delayed. On January 27, 1991, Robert died of cerebral edema, brain metastases, and cancer of the kidneys.

On February 19, 1991, Jean applied for Social Security Survivor's Insurance benefits and, on behalf of her two children, for Child's Insurance benefits. Benefits were initially awarded. However, on May 27, 1991, the Social Security Administration (SSA) revoked the benefits on the ground that Jean and Robert had not been married for nine months before Robert died.**2** Jean moved for reconsideration, and the SSA again found that she was not entitled to benefits. Jean then requested an administrative hearing, which was held on June 11, 1992.

The ALJ joined a third party, Renee D'Accardi (Robert's child from a previous marriage). At the hearing, Vanessa, 7, and Joaquin, 12, testified that they called Robert "Daddy," did chores for him, and were disciplined by him. Joaquin testified that Robert had discussed adoption with him as early as Christmas 1989. Both children testified that they wanted Robert to be their father. Robert was the only father Vanessa had known, as she had not seen her natural father since the age of six months. The ALJ concluded that, because Jean met the nine-month marriage duration requirements of the Social Security

_____

**1** Despite delays in the proceedings, the adoption process apparently continued. On December 18, 1990, Attorney Keller sent the D'Accardis an interim bill for adoption-related services rendered through November 28, 1990.

**2** An individual may be entitled to widow's or mother's benefits on the deceased wage earner's record if she was married to the wage earner for at least nine months preceding his death. 20 C.F.R.§§ 404.335(a)(1), 404.339. The same durational requirement applies to a stepchild: if he or she was the stepchild of the wage earner for at least nine months immediately before the death, he or she may qualify for child's insurance benefits. 20 C.F.R. § 404.356.

Act, she was eligible for mother's insurance benefits and her children were entitled to stepchild's benefits. In addition, the ALJ concluded that, because adoption would have occurred but for Robert D'Accardi's death, Vanessa and Joaquin were also entitled to benefits as equitably adopted children.

After the hearing, Renee D'Accardi submitted a statement by attorney Dino Bliablias--also with the Stein, Bliablias firm--that in late 1990, Robert had stated that he wished to discontinue the adoption process "for personal reasons" and had asked Bliablias to inform Mrs. D'Accardi. Bliablias never did so. In response, Jean D'Accardi certified that, although she saw her husband nearly every day until his death, and saw Mr. Bliablias and other firm attorneys several times at Robert's parents' home and at the hospital before Robert's death, no one indicated to her that Robert had had a change of heart. The adoption process continued until Attorney Keller informed the surrogate court of Robert's death, and requested that the action be dismissed for that reason.

On July 21, 1994, the Appeals Council reversed the findings of the ALJ. The Council found that the D'Accardis had not been married for the requisite nine months. Thus, it found, Jean was not entitled to mother's benefits and her children were not entitled to benefits as stepchildren. The Council further found that, because Robert D'Accardi had indicated an intention to discontinue adoption proceedings, any agreement to adopt expired, and Vanessa and Joaquin therefore were not eligible for benefits as equitably adopted children. On September 20, 1994, Jean filed a complaint in the Eastern District of North Carolina seeking judicial review of the Commissioner's decision under Title II of the Social Security Act, 42 U.S.C. § 402 et seq.[3]

In the district court, a magistrate judge found that the Commissioner's finding that Jean and Robert D'Accardi had not been married for nine months was based upon substantial and undisputed evidence, and that it was in accordance with the SSA's interpretation of its own regulations and was therefore entitled to deference. The magistrate judge

_____

[3] On January 22, 1995, Renee D'Accardi stipulated that she no longer had an interest in the matter, and was dismissed as a defendant.

4

also found that the Appeals Council properly denied the child's insurance benefits as stepchildren based on the same nine-month period. In addition, the judge upheld as based on substantial evidence the Appeals Council's finding that Robert wished to discontinue adoption proceedings, and found that the children were therefore not entitled to benefits as equitably adopted children. District Judge Fox adopted the magistrate judge's findings and conclusions, and affirmed the final decision of the Secretary of Health and Human Services.

II.

Jean D'Accardi challenges the Commissioner's decision**4** that Vanessa and Joaquin Vigil are not entitled to surviving child's insurance benefits as the equitably adopted children of the deceased wage earner. In reviewing the final benefits decision of the Commissioner, we apply the same standards as did the district court to determine whether the decision was based upon substantial evidence and correct conclusions of law. 42 U.S.C. § 405(g); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

An applicant for child's benefits must show, among other things, that he or she is the "child" of the insured worker. 20 CFR § 404.350-369. "Child" includes a natural child, a grandchild, a legally adopted child, or an equitably adopted child. Id. at§ 404.354(a). The regulations define an equitably adopted child as one whom the insured agreed to adopt, but whose legal adoption did not actually occur. Id. at § 404.359. The regulations specify:

> The agreement to adopt [the child] must be one that would be recognized under State law so that [the child] would be able to inherit a child's share of the insured's personal property if he or she were to die without leaving a will. The agreement must be in whatever form, and [the child] must meet whatever requirements for performance under the agreement, that State law directs. If [the child] appl[ies] for child's benefits after the insured's death, the law of the State

_____

**4** Jean does not appeal from the decision denying benefits to her personally.

5

where the insured had his or her permanent home at the time of his or her death will be followed.

Id. Thus, if under state law, Vanessa and Joaquin would have been entitled to share in Robert D'Accardi's intestate estate, they may be eligible for child's insurance benefits.

There is no dispute that the law of the state of New Jersey applies to this case, as Robert D'Accardi was a New Jersey resident at the time of his death. New Jersey recognizes the doctrine of equitable adoption as a theory of inheritance under intestacy:

> It is now firmly established that an oral agreement to adopt, where there has been a full and faithful performance on the part of the adoptive child, but which was never consummated by formal adoption proceedings during the life of the adoptive parent, will, upon the death of the latter, and when equity and justice so requires, be enforced to the extent of decreeing that such child occupies in equity the status of an adopted child, entitled to the same right of inheritance from so much of his foster parent's estate that remains undisposed of by will or otherwise, as he would have been had he been a natural born child.

Burdick v. Grimshaw, 168 A. 186, 188 (N.J. Ch. 1933); see also Ashman v. Madigan, 122 A.2d 382, 383 (N.J. Super. Ct. Ch. Div. 1956) (finding that statements and conduct of decedent demonstrated the existence of an enforceable agreement to adopt); Hendershot v. Hendershot, 37 A.2d 770, 772 (N.J. Ch. 1944) (ruling that testator made binding oral agreement to adopt, which gave complainant the status of a legally adopted child for inheritance purposes).[5]

_____

[5] We are at a loss to explain the assertion by the New Jersey Superior Court that "New Jersey has not recognized `equitable adoption' in any case that research has disclosed." In re: the Adoption of a Child by N.E.Y., 630 A.2d 835, 839 (N.J. Super. 1993) (ruling that the court had no authority under statute or case law to use the theory of equitable adoption to finalize a decree of legal adoption for purposes of favorable inheritance tax treatment and Social Security benefits).

6

Proof of the existence of an agreement to adopt and accompanying consideration is sufficient to support a finding of equitable adoption. See Hendershot, 37 A.2d at 772. The acts, conduct and admissions of an adopting party may be used to prove the existence of an adoption agreement. See Ashman, 122 A.2d at 383. Written agreements are satisfactory evidence of an adoption agreement. Burdick, 168 A. at 190. In addition to the complaint for adoption, the plaintiffs presented evidence that the children called Robert "Daddy"; that Robert assigned chores to and disciplined the children; that they went on family vacations together; that Robert told the children of his desire to adopt them to show them how much he loved them; and other related testimony. The plaintiffs add that sufficient legal consideration for the agreement to adopt was present in the children's love and affection, their performance of duties, and their companionship and obedience. See Hendershot, 37 A.2d at 772-73.

The Commissioner concedes that the plaintiffs' testimony was "consistent and convincing" and that it tended to show that the plaintiffs believed that there existed an agreement to adopt. However, the appellee points to certified statements by Robert D'Accardi's attorneys that, before his death, Robert decided to discontinue the adoption process. She argues that such statements cast doubt on the continued existence of an agreement to adopt. The Appeals Council agreed, finding that "[s]ince the record shows that, prior to his death, the wage earner indicated that he wished to discontinue the adoption of Vanessa and Joaquin, any expressed contract by the wage earner to adopt them expired prior to his death."

Jean D'Accardi counters that Robert's intention at the time of his death to discontinue the adoption proceedings did not nullify an existing enforceable agreement to adopt. Jean relies on Hendershot v. Hendershot, in which the plaintiff successfully challenged his exclusion from his stepfather's will based on the theory of equitable adoption. The court found that the deceased had promised to adopt the complainant and to include him in his will. A stepfather's subsequent change of heart has no effect on an earlier agreement to adopt, the court held, once the child has performed in whole or in part. Id. at 772. Accordingly, Jean D'Accardi argues, because her children performed their part of the contract, Robert's alleged intent not to perform does not nullify the agreement.

7

There is little question that Jean D'Accardi presented "clear, cogent and convincing" evidence "leaving no doubt with respect to [the oral agreement's] actual making and existence." Burdick, 168 A. at 189. The question for this court is whether, under New Jersey law, a death-bed unilateral decision to discontinue adoption proceedings nullifies an earlier agreement for the purpose of determining the child's right to inherit from the adoptive parent's intestate estate. Burdick, Hendershot, and Ashman reveal that, when there exists a valid and binding contract to adopt, supported by consideration, New Jersey courts will enforce the contract in equity to allow a child to occupy the status of a legally adopted child for certain purposes. The Commissioner cites no case law suggesting that ordinary contract principles do not apply in such a situation. We reject, therefore, her unusual assertion that the changed intent of a promisor nullifies the existence of a valid contract, and find that she erred as a matter of law in relying upon evidence of Robert D'Accardi's desire to discontinue adoption proceedings. Accordingly, we need not address Jean D'Accardi's contention that the Commissioner's decision was not supported by substantial evidence.

III.

We reverse the decision of the district court and remand the case to the district court for further remand to the Appeals Council, with directions to award benefits.

REVERSED AND REMANDED WITH INSTRUCTIONS

8